**UNITED STATES COURT OF INTERNATIONAL TRADE**
**NEW YORK, NEW YORK**

| | |
|---|---|
| AQUA ROYALE FOODS, INC., | |
| Plaintiff, | |
| v. | Case No. 25-00957 |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*, | |
| Defendants. | |

**COMPLAINT**

Plaintiff, AQUA ROYALE FOODS, INC., by and through its undersigned attorney, alleges and claims the following against the Defendants:

**INTRODUCTION**

1. Through a series of executive orders, proclamations, and memoranda, the President of the United States has declared national emergencies, imposed tariffs on imported merchandise, and modified tariff rates, timing, and scope. These measures are unlawful and unconstitutional.

2. The President claims authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1708, to impose sweeping tariffs on goods imported into the United States. But IEEPA does not authorize the President to levy tariffs, and Congress has never delegated such power. The President's actions exceed the bounds of any statute and violate the Constitution's separation of powers by arrogating to the executive branch Congress's exclusive authority to impose duties and regulate commerce with foreign nations.

3. The national emergencies declared by the President do not constitute "unusual and extraordinary threats" within the meaning of IEEPA. Instead, they rest on ordinary economic conditions, such as trade deficits and foreign competition, that have existed for decades and cannot plausibly justify emergency action. The President's reliance on IEEPA to unilaterally impose tariffs is therefore unlawful.

4. Even if IEEPA could be read to confer such authority, its application here would render the statute unconstitutional. A construction that allows the President to impose duties of any kind, in any amount, on any country, at any time, would represent an impermissible delegation of Congress's legislative power under Article I, Section 8, to lay and collect taxes, duties, imposts, and excises.

5. The challenged executive actions have caused and will continue to cause substantial harm to American importers, including Plaintiff, who are required to pay unlawful duties, alter established supply chains, and absorb economic losses as a direct consequence of measures imposed without congressional authorization.

6.  This Court should declare the President's actions unlawful, set aside the tariffs imposed pursuant to them, enjoin further enforcement or collection under the challenged orders, and order the refund of any duties unlawfully collected.

## JURISDICTION

7.  The Court of International Trade has exclusive jurisdiction to hear this action under 28 U.S.C. §1581(i), which gives the Court:

exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

   (A) revenue from imports or tonnage;

   (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

   (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

   (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

28 U.S.C. §1581(i)(1). *See also, V.O.S. Selections, Inc. v. United States*, 772 F.Supp.3d 1350, 1365-1366 (2025).

8.  The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

9.  The Court also has "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential

directives". 28 U.S.C.A. §1581(i); *V.O.S. Selections*, 772 F.Supp. 3d at 1367, quoting *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022).

10. This action has been commenced within two years of the date that the cause of action first accrues and, as such, it satisfies the timeliness requirement in accordance with 28 U.S.C. § 2636(i).

## PARTIES

11. Plaintiff Aqua Royale Foods is a New Jersey corporation with its principal place of business in Paramus, New Jersey. Aqua Royale Foods is an established importer and the importer of records of various goods on which IEEPA duties were paid.

12. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

13. Defendant Executive Office of the President is an agency of the United States government headquartered in Washington, D.C. It oversees the implementation of the President's directives and the Office of the United States Trade Representative.

14. Defendant United States of America is the sovereign government of the United States.

15. Defendant United States Customs and Border Protection ("CBP") is an agency within the Department of Homeland Security charged with administering and enforcing the collection of tariffs, duties, and other import restrictions under the Harmonized Tariff Schedule of the United States. CBP is headquartered in Washington, D.C.

16. Defendant Pete R. Flores is the Acting Commissioner of U.S. Customs and Border Protection and is sued in his official capacity.

17. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

18. Defendant United States Trade Representative ("USTR") is a component of the Executive Office of the President that develops and coordinates U.S. international trade policy. It is headquartered in Washington, D.C.

19. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

## STANDING

20. Plaintiff has standing to sue because it is "adversely affected or aggrieved by agency action within the meaning of the APA. 5 U.S.C. § 702; 28 U.S.C. § 2631(i). IEEPA Duties imposed by Defendants adversely affected and aggrieved Plaintiff because, as importer of record, it was required to pay and did pay these unlawful duties. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc*., 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiff will no longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs. Plaintiff also faces imminent and irreparable harm due to uncertainty as to whether Defendants will issue refunds of the IEEPA Duties as to liquidated entries.

## FACTS

### A. National-Emergency Framework and IEEPA's Limits

21. Congress enacted the National Emergencies Act (NEA) to cabin and supervise any resort to emergency powers; it requires a formal proclamation, publication in the Federal Register, transmittal to Congress, identification of the statutes invoked, and periodic

renewal or termination. The NEA also provides expedited procedures for Congress to terminate an emergency.

22. The International Emergency Economic Powers Act (IEEPA) permits the President—upon a proper NEA emergency—to regulate certain international economic transactions to address an "unusual and extraordinary threat" with a substantial foreign source to U.S. national security, foreign policy, or the economy. IEEPA's authorities are triggered only after a NEA-compliant emergency is declared, and they may be exercised only to meet the specified threat. IEEPA does not itself delegate a general tariff-making power.

**B.    2025 Executive Tariff Program and Phased Escalations**

23. On February 1, 2025, the President issued Executive Order 14195, imposing a 10 percent ad valorem duty on products of the People's Republic of China, effective 12:01 a.m. eastern time on February 4, 2025; the order was published in the Federal Register on February 7, 2025. The order also directed special treatment for goods admitted to foreign-trade zones on or after that effective date.

24. On March 3, 2025, the White House issued a further amendment (identified in Federal Register materials as Executive Order 14228) increasing the China rate from the initial 10 percent to 20 percent and adjusting related mechanics. Subsequent April 2, 2025 materials addressed application to low-value imports previously moving under *de minimis*.

25. On April 2, 2025, the President issued Executive Order 14257, establishing a reciprocal-tariff framework tied to large and persistent U.S. goods trade deficits, with country-specific ad valorem rates listed in annexes. Unless otherwise provided, the order applied beginning 12:01 a.m. eastern daylight time on April 9, 2025, to goods entered for consumption (or withdrawn from warehouse) on or after that time. Critically, the annexes included a "on

the water" exemption clause for goods "loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. [EDT] on April 9, 2025," subject to enumerated exceptions.

26. On April 9, 2025, an order modified reciprocal rates to reflect trading-partner retaliation and alignment; on April 11, 2025, a presidential memorandum clarified exceptions and carve-outs (including specified HTS headings).

27. Through mid-2025, the White House and Federal Register issued follow-on actions adjusting timing and suspensions, including a July 10, 2025 extension of reciprocal-rate modifications to 12:01 a.m. EDT on August 1, 2025, and later updates relating to PRC-specific treatment.

28. On July 30, 2025, the President issued Executive Order 14323, "Addressing Threats to the United States by the Government of Brazil," declaring a national emergency under IEEPA/NEA and imposing an additional duty on Brazilian-origin products. The Federal Register publication (Aug. 5, 2025) confirms an "on the water" exemption provision: goods are exempt if (1) they were loaded at the port of loading and "in transit on the final mode of transit" before 12:01 a.m. EDT seven days after the order, and (2) they are entered for consumption (or withdrawn from warehouse) before 12:01 a.m. EDT on October 5, 2025.

29. On July 31, 2025, the President amended earlier "northern border" duties to increase the Canadian rate to 35 percent, effective August 1, 2025, as reflected in White House and contemporaneous notices.  Also on July 31, 2025, Executive Order 14257 was amended "Further Modifying the Reciprocal Tariffs Rates."

30. On August 6, 2025, the President issued Executive Order 14329 ("Addressing Threats to the United States by the Government of the Russian Federation"). Implementing guidance

from U.S. Customs and Border Protection and the Federal Register followed on August 27, 2025, specifying additional duties on "products of India" and setting an "entered before" date for entries already in transit. Trade compliance bulletins summarize the CBP implementation: entries before 12:01 a.m. EDT on September 17, 2025, could qualify for prior rates.

31. As a statutory basis, the Liberation Day Order, Executive Order 14323, Executive Order 14257, and Executive Order 14329 all cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

32. None of these statutes grants the President the authority to impose tariffs, and the extent that the provide for any relief, there must be an actual "emergency". Such statutes do not permit the taking of relief on an unsupported pretext.

33. The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

34. Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

35. Congress knew how to grant the President tariff authority when it wants to.

36. Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of

emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

37. Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

38. IEEPA provides that the President may:

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702.

39. IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

40. The word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

41. No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Cong. Research Serv., *Congressional and Presidential Authority to Impose Import Tariffs*, R48435, at 20 (April 23, 2025), https://crsreports.congress.gov/product/pdf/R/R48435

42. The "unusual and extraordinary threat" asserted as a "national emergency" by the Liberation Day Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

43. According to the Liberation Day order, the President "find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural. imbalances in the global trading system. I hereby declare a national emergency with respect to this threat."  Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To*

*Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 7, 2025).

44. In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

45. Trade deficits are not unusual or extraordinary—the United States has run a persistent trade deficit since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St.Louis, May 17, 2019 (https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits?utm_source=chatgpt.com).

46. That necessarily includes bilateral trade deficits with many individual nations.

47. Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.13

48. Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

49. Section 604 is a bookkeeping provision: it assigns to the President the task of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

50. The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. 37.

51. 3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

52. The Administration is now trying to reframe its actions and by re-labeling the tariffs as surcharges in order to alter the constitutional reality,

53. At an October 15, 2025 Treasury Department press conference, Treasury Secretary Scott Bessent was asked directly why the President's tariffs on imported goods were not taxes. Secretary Bessent responded: "That is easy, because tariffs are a surcharge. They could be paid by the port—or exporter—they could be paid by the country. When you get a driver's license, you pay a fee. Is that a tax?"  Treasury Sec'y Scott Bessent & U.S. Trade Rep. Jamieson Greer, Press Conference (Oct. 15, 2025 11:03 PM – 11:31 PM), C-SPAN  (video at 11:19 PM), available at https://archive.org/details/CSPAN_20251016_030300_Treasury_Secy._Bessent__U.S._Trade_Rep._Greer_Hold_Press_Conference_on.../start/960/end/1020

54. This statement reflects the administration's evolving position that the tariffs imposed under Executive Order 14257 and related proclamations are merely "surcharges" or "fees," not "taxes," and thus fall outside the scope of Article I, Section 8's limits on Congress's exclusive authority "to lay and collect Taxes, Duties, Imposts, and Excises."

55. Tariffs are duties within the meaning of Article I, Section 8, regardless of nomenclature. They are imposed on imported goods, collected at the border, and generate revenue for the Treasury—precisely the attributes of a tax. The administration's semantic distinction underscores the weakness of its position: having conceded that Congress did not authorize these duties under IEEPA, it now attempts to avoid judicial scrutiny by asserting that the exactions are not "taxes" at all.

56. The contention that a tariff is not a tax defies both the plain meaning of the word and the understanding established through long-standing historical and legal usage. "A tariff is a tax levied on imported goods and services." Cong. Research Serv., *U.S. Tariff Policy: Overview*, IF11030, at 1 (Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030.

## C.    Three Courts Have Held that IEEPA Does Not Authorize Assessment of Duties

57. On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections*, holding that IEEPA did not authorize assessment of IEEPA Duties. This Court permanently enjoined the government from enforcing the IEEPA Duties at issue in that case.

58. Upon appeal, the Federal Circuit stayed this Court's decision.

59. Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA Duties are unlawful. *See V.O.S. Selections*.

60. In a separate lawsuit filed by a different group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. See Learning Resources. That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*.

61. The cases were consolidated, with argument before the Supreme Court on November 5, 2025.

**D.    Aqua Royale Foods and the 2025 tariff program**

62. Plaintiff's imports are subject to IEEPA Duties entered the United States under new HTSUS codes. As of the date of this Complaint, Plaintiff has paid IEEPA duties imposed by the IEEPA Tariff Orders.

63. Plaintiff brings this action to set aside and enjoin the challenged duties, and to recover the duties paid under the challenged Executive Orders.

## STATEMENT OF CLAIMS

**Count I: The President's Action Levying Tariffs Exceeds His Statutory Authority.**

64. The allegations of paragraphs 1 through 63 are incorporated by reference and restated as if fully set forth herein.

65. Presidential authority to unilaterally impose worldwide tariffs, if Congress were to grant it at all, must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. at 125 (quoting *Whitman*, 531 U.S. at 468) ("Congress does not usually 'hide elephants in mouseholes.'").

66. IEEPA does not mention tariffs or duties, nor at any point does it suggest that it is granting the power to lay and collect such tariffs or duties.

67. There is no precedent for using IEEPA to impose tariffs. No other President has ever done so or ever claimed the power to do so.

68. The existence of trade deficits in goods with some other countries does not qualify as a national emergency, as required by IEEPA.

69. The existence of trade deficits in goods with some other countries is not an unusual and extraordinary threat, as required by IEEPA.

70. The prosecution of the former leader of a third-country for corruption does not constitute a national emergency nor is it an unusual and extraordinary threat, as required by IEEPA.

71. Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades-old statutes. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

72. Indeed, Congress passed IEEPA to limit what it saw as presidential abuses of emergency authorities in the years prior to 1977. Peter E. Harrell, *The Case Against IEEPA Tariffs*, Lawfare, Jan. 31, 2025 (available at https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs).

73. Congress knows how to grant the President authority to impose or adjust tariffs when it wishes to, and it has done so in more limited statutes contained in Title 19 of the United States Code. But the President has decided to avoid the limits on his authority imposed by Congress by finding a new never-before-seen authority under IEEPA.

74. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

75. IEEPA does not grant the President power to impose tariffs at all—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

76. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). The assertion that IEEPA grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

77. "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

78. The Administration is now attempting to reframe the tariffs as "surcharges" or "fees" to avoid constitutional scrutiny, with Treasury Secretary Scott Bessent publicly asserting that "tariffs are a surcharge" comparable to paying a driver's license fee. This re-labeling does not change their essential character as taxes on imported goods within the meaning of Article I, Section 8.

79. The Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 billion over the next ten years, reducing US gross domestic product by some 0.8% (without

accounting for retaliation by foreign states). Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025 (available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade- war).

80. This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin*., 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

81. The tariffs illegally imposed by the President via IEEPA directly and irreparably harm Plaintiff, who will face increase costs for the goods they sell, less demand for their higher priced products, and disrupted supply chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise solvent companies.

82. The executive orders challenged in this Complaint are materially identical in structure, authority claimed, and effect to those struck down in *V.O.S. Selections* and Learning *Resources*. They purport to impose duties and to modify the HTSUS solely under IEEPA. For the same reasons set forth in *V.O.S. Selections*, the IEEPA Tariff Orders exceed the President's statutory authority and are therefore unlawful, void *ab initio*, and without effect as applied to Plaintiff.

83. Plaintiff respectfully requests that this Court declare the IEEPA Tariff Orders unlawful as to Plaintiff, enjoin Defendants from enforcing them as to Plaintiff, and order refund of all IEEPA Duties collected from Plaintiff, with interest as provided by law.

**Count II: If the IEEPA Grants Broad, Unlimited Authority to Issue Tariffs Worldwide to the President, It Is an Unconstitutional Delegation of Legislative Authority**

84. The allegations of paragraphs 1 through 63 are incorporated by reference and restated as if fully set forth herein.

85. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

86. The nondelegation doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and all such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

87. Implicit in this setup is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

88. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

89. The Court therefore requires that any grant of regulatory authority be provided with an "intelligible principle" that will form the basis of agency action. *See A.L.A. Schechter*

*Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

90. The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U. S. 414, 426 (1944)).

91. IEEPA does not authorize tariffs at all, and this Court should so hold, by applying the rule of constitutional avoidance if necessary. But even if IEEPA did grant the President the broad, standardless discretion he claims—which it does not—and had done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

92. If there are any constitutional limits to delegation at all, they apply here, in a case where the executive claims virtually limitless authority to impose massive tax increases and start a worldwide trade war. This is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; see id. at 542 (noting that the NRA gave the "virtually unfettered'' discretion to the President "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country").

93. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't*, 448 U.S. at 645.

94. This interpretation would render the Act the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise

of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

95. This interpretation of the IEEPA would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't*, 448 U.S. at 646 (quoting *Schechter Poultry*, 295 U.S. at 539).

96. If longstanding, perfectly normal, bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," the same can be said of virtually any international economic transaction that the President disapproves of for virtually any reason. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

97. The sheer breadth of this claimed power—to impose tariffs at any level on any country at any time, at levels that could very well crash the global economy— counsels against reading IEEPA to confer such an extreme delegation of authority. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

98. IEEPA provides no intelligible principle for the imposition of tariffs—indeed, it provides no principle at all by which this Court, or anyone else, might determine whether the guidance Congress provided has been followed.

99. The tariffs illegally imposed by the President via the unconstitutional delegation of authority under IEEPA directly and irreparably harm Plaintiff, who will face increase costs

for the goods they sell, less demand for their higher prices products, and disrupted supply chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise-solvent companies.

100.     The executive orders challenged in this Complaint are materially identical in structure, authority claimed, and effect to those struck down in *V.O.S. Selections* and Learning *Resources*. They purport to impose duties and to modify the HTSUS solely under IEEPA. For the same reasons set forth in *V.O.S. Selections*, the IEEPA Tariff Orders exceed the President's statutory authority and are therefore unlawful, void *ab initio*, and without effect as applied to Plaintiff.

101.     Plaintiff respectfully requests that this Court declare the IEEPA Tariff Orders unlawful as to Plaintiff, enjoin Defendants from enforcing them as to Plaintiff, and order refund of all IEEPA Duties collected from Plaintiff, with interest as provided by law.

**Count III: Declaratory Relief, 28 U.S.C. § 2201**

102.     Plaintiff re-alleges and incorporates paragraphs 1 through 63 as if fully set forth herein.

103.     In the alternative to Counts I and II, Plaintiff alleges that federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

104.     Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of Defendants to implement and collect the resulting tariffs.

105.     Plaintiff is an importer of record and has suffered injury by having been required to pay IEEPA Duties as a result of the IEEPA Tariff Orders on goods it has imported into the United States.

106.     This Court should exercise its equitable power to enter a declaratory judgment that the IEEPA Tariff Orders are unlawful for any or all of the above reasons, and that Defendants lack authority to implement and collect the resulting tariffs, as to Plaintiff.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

a.  Declare that IEEPA does not grant the President statutory authority to impose tariffs;

b.  Declare that the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

c.  Declare that the President has failed to make any showing of an "unusual and extraordinary threat" as required by IEEPA;

d.  Declare that, if Congress has granted the President unilateral authority to impose global tariffs of any amount at his whim, it is an unconstitutional delegation of legislative power;

e.  Declare that the IEEPA Tariff Orders are *ultra vires* and void *ab initio* with respect to Plaintiff;

f.  Declare that, with respect to Plaintiff, Defendants lack authority to implement and collect any tariffs set out in the HTSUS that are based on the IEEPA Tariff Orders;

g.  Enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the IEEPA Tariff Orders with respect to Plaintiff;

h.  Order the United States to refund to Plaintiff the IEEPA duties collected on those entries, with interest as provided by law;

a.  Award Plaintiff other such damages as are appropriate;

b.  Award Plaintiff attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

c.  Grant any such other relief as this Court may deem just or proper.

Dated: December 16, 2025                        Respectfully Submitted,

_／s／ Vinicius Adam, Esq.___
Vinicius Adam
VAdam Law
511 SE 5th Ave., Suite 104
Fort Lauderdale, FL 33301
Phone: (954) 451-0792
Fax: (267) 430-8862
vinicius@vadamlaw.com
service@vadamlaw.com
Attorney for AQUA ROYALE FOODS, INC.